UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-62064-RUIZ/STRAUSS

MUNAWAR TOHA,

      Plaintiff,

v.

FLORIDA ATTORNEY GENERAL, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") [DE 1], filed by Petitioner, Munawar Toha, on October 9, 2020.  This case has been referred to me, pursuant to 28 U.S.C. § 636(b) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, to take all action as required by law on the Petition [*see* DE 11].  I have reviewed the Petition, the Response [DE 5] and Reply [DE 12] thereto, and the record in this case.[1]  For the reasons discussed herein, I respectfully **RECOMMEND** that the Petition [DE 1] be **DENIED**.

### I. GROUNDS RAISED IN PETITION (INEFFECTIVE ASSISTANCE OF COUNSEL)

    1.     Failure to move to suppress incriminating recordings; and

    2.     Failure to file motion in limine to exclude irrelevant and prejudicial evidence.

---

[1] Citations to "T. [page]" refer to the trial transcript [DE 7-1].  References to page numbers from the trial transcript are to the page numbers reflected on the transcript itself (not the ECF-stamped page numbers).  Citations to exhibits (*e.g.*, Ex. 1) refer to exhibits contained in the Appendix [DE 9-1].  When specific pages of exhibits are cited, however, I use the citation "R. [page]."  By way of example, "R. 110" refers to page 110 of DE 9-1.

## II. <u>BACKGROUND</u>

### A. **PROCEDURAL HISTORY**

On October 22, 2014, a jury found Petitioner guilty of First-Degree Murder. Ex. 2. Consequently, he was adjudicated guilty by the state trial court, Ex. 3, and he was sentenced to life in prison, Ex. 4. Petitioner then filed an appeal. Ex. 5. On May 11, 2017, the state appellate court issued a *per curiam* affirmance. Ex. 8. The mandate followed on June 9, 2017. Ex. 9. Petitioner subsequently filed (on May 4, 2018 in the state trial court) a Motion to Vacate Judgment of Conviction and Sentence, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. Ex. 10. The State filed a response to that motion on December 27, 2018. Ex. 11. On January 16, 2019, the state trial court issued an Order Denying Defendant's Pro Se Motion to Vacate Judgment of Conviction and Sentence. Ex. 12. The order did not explain the reasons for denial beyond attaching the State's response. *See id.* Petitioner then appealed that order, Ex. 13, and on May 7, 2020, the state appellate court issued a *per curiam* affirmance, Ex. 16. Petitioner filed a motion for rehearing, Ex. 17, which was denied, Ex. 18. The mandate followed on July 10, 2020. Ex. 19.

### B. **FACTUAL BACKGROUND**

Petitioner was convicted of murdering his wife, Surya Toha ("Surya"). Surya was last seen on the morning of March 23, 2010. Petitioner informed law enforcement that he last saw his wife around 7:50 a.m. that morning when she left to bring their children to the children's elementary school. T. 441. Additionally, school personnel testified that Surya dropped the children off that morning but that she was not seen at the school after dropping them off on the morning of March 23, 2010. *See* T. 371-79. Petitioner picked the children up from school that afternoon and dropped them off next the morning. T. 372-73, 376, 378-80. Prior to that, Surya had always been the one to drop off and pick up the Toha children. T. 371-72, 375-79.

2

Around 5:00 or 6:00 p.m. on March 23, 2010, Petitioner went with his children to the house of Rahadian Putra ("Putra") and Mariana Tjong ("Tjong"), a married couple who were friends of the Tohas.  T. 405-07, 418-20, 424.  At trial, they testified that Petitioner asked for their help with his children and that he asked Putra to help him find Surya.  T. 407-09, 424-27.  Petitioner and Putra drove around for about 45 minutes before returning to Putra's home.  T. 408-10, 426-27. Thereafter, Petitioner went home but left his children with Putra and Tjong.  T. 410, 427.  Petitioner returned to the home of Putra and Tjong around 1:00 a.m. with his bicycle, stating that he had gone out to look for his wife.  T. 411-12, 427-28.  After an hour or two, Petitioner asked Putra for a ride home; however, Petitioner had Putra drop him off at a gas station instead, without providing an explanation.  T. 411-12.

On April 3, 2010, law enforcement went to an industrial park where Plaintiff worked to search for signs of Surya's vehicle.  T. 673-74, 687, 899-900.  They noticed, among other things, that a section of fence near a lake was broken and that there was enough space for a car to go through the broken section.  T. 674-76, 688.  A video camera was pointed in the direction of that area.  T. 676.  Therefore, on April 5, 2010 (the next business day), law enforcement went to, and did, obtain the March 23, 2010 footage from that camera.  *See* T. 677, 904-05.  Clips from that footage showed an individual (who could not be identified on the footage) push a vehicle into the lake and then leave on a bicycle.  T. 702, 905-06.  This occurred sometime around 11:00 p.m. on March 23, 2010.  T. 709-10.

On the evening of April 5, 2010, the vehicle was retrieved from the lake, and Surya's body was found in the passenger seat of the vehicle.  T. 704-06, 906-07.  Black plastic bags with tape were found on her feet and head.  T. 549-54.  Surya's DNA was found on the tape.  T. 802-05, 817.  No DNA on the tape could be matched to anyone other than Surya, including Petitioner.  T.

805, 810-11, 825.  In examining Surya's body, the medical examiner's office concluded that Surya was killed as a result of her head being hit with blunt force at least five times.  T. 739-48.

After retrieving the vehicle and Surya's body, law enforcement went to the Toha residence. *See* T. 497, 501-02.  They found several blood stains in multiple areas, including in the kitchen, in the doorway leading to the garage, and in the garage.  *See* T. 521-23, 526-44, 623-29.  They determined that Surya's injuries were likely sustained in the kitchen and that she died from blunt force trauma to her head.  *See* T. 629-31.  Law enforcement also found black plastic bags and rolls of packing tape, which it considered relevant because of the bags and tape found on Surya's body. T. 546-49.  Nonetheless, law enforcement was unable to develop forensic leads from the tape and bags found on Surya's body.  T. 582.  Additionally, while law enforcement found clear tape at the Toha residence, it could not confirm whether the clear tape found on Surya's body was the same tape.  *See* T. 598-99.  Likewise, while it considered the black plastic bags to be consistent with the bags found on Surya, it could not confirm that the bags came from the same roll of bags.  T. 600.

At Petitioner's trial, the last witness to testify was William Walker ("Walker"), an investigator with the Broward County State Attorney's Office, who was employed by the Fort Lauderdale Police Department as a detective at the time of Surya's death.  T. 849, 929.  According to Walker, an inmate named Oscar Izquierdo ("Izquierdo") had contacted Walker to inform him that he met another inmate (Petitioner) that wanted to have some witnesses killed.  T. 850, 929-30.  Izquierdo then put Petitioner in touch with Walker by calling Walker (who played the role of undercover hitman) and handing the phone over to Petitioner (apparently after the warning about the call being recorded was played).[2]  *See* T. 850, 852, 930.  Recordings of two calls between

---

[2] Izquierdo also introduced other inmates to Walker under similar circumstances.  *See* T. 946-47.

Walker and Petitioner were played at trial (with recordings of two other calls also being admitted into evidence). *See* T. 851, 932-43.

In the first recording played at trial, Petitioner told Walker that "the reason I'd like to talk to you about is a matter you could help me to clean house[.]" T. 932. Petitioner then provided Putra's and Tjong's names (and other information) to Walker. T. 932-33. At that point (and it is unclear why at that point), Walker asked Petitioner, "There's nobody standing around you; right?" T. 934. Petitioner stated, "Yes, there is, but nobody . . .," at which point Walker told Petitioner that if someone was listening in to their phone call, all that person would hear is static because Walker had something on his phone. *Id*. Walker told Petitioner he "want[ed] to make sure nobody is standing around you." Petitioner replied, "No," and then quickly returned to providing more information about Putra and Tjong. T. 934-35. He also indicated that he preferred to have Putra and Tjong deported if that was possible. T. 935-38. Petitioner mentioned, "I have other two," but stated, "Let's just continue next time, 'cause it's too loud here, it's very loud." T. 937. Petitioner then confirmed that he had two other people to discuss with Walker but that "we'll continue later." *Id*.

In the second recording, Petitioner provided Walker with the names and information of two additional individuals, Betty Matthew and Ade Pnakovich ("Pnakovich"). T. 939. He indicated that he did not want to see Pnakovich show up in court as a witness against him. T. 940-41. Pnakovich, who did testify at Petitioner's trial, was a friend of Surya's who had not seen her since late 2008. T. 350. According to Pnakovich, Petitioner would not let Surya speak to or see Pnakovich. *See* T. 350-51.

## III. <u>LEGAL STANDARDS</u>

### A. AEDPA

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). As amended by AEDPA, title 28 U.S.C. § 2254(a) permits a federal court to issue "a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" if that custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A deferential standard applies, however, to federal courts' review of petitions for habeas relief due to "the State's interest in the finality of convictions that have survived direct review within the state court system" and based upon principles of "comity and federalism." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (citations omitted) ("Federal intrusions into state criminal trials frustrate both the States' sovereign power . . . and their good faith attempts to honor constitutional rights.").

Indeed, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Relevant limitations on habeas relief are set forth in § 2254(d), which states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A federal habeas court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Furthermore, a state court may adjudicate a claim "on the merits" without issuing a formal opinion or outlining its reasoning. *Harrington*, 562 U.S. at 99. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* Furthermore, when a state court does not include any reasons for the denial of a collateral attack, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

The "contrary to" prong of § 2254(d)(1) means that a state court decision "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite] result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In other words, "the state court's decision must be substantially different from the relevant [Supreme Court] precedent." *Id.*

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The focus of the . . . inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* "[A] federal habeas court may not issue the writ simply because [the] court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Error correction is the function of state-level appeals, whereas "[f]ederal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and internal quotation marks omitted). Thus, "[t]o satisfy [the 'unreasonable application' prong's] high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (citation and internal quotation marks omitted).

An alternative avenue for habeas relief is provided in § 2254(d)(2), which applies when the state court's determination of the facts was unreasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "'[A] determination of a factual issue made by a State court shall be presumed to be correct,' and the prisoner bears 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1264 (11th Cir. 2020) (quoting 28 U.S.C. § 2254(e)(1)). *But see Burt*, 571 U.S. at 18 ("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1).").

As with § 2254(d)(1), a federal habeas court "accord[s] the state trial court substantial deference" for claims brought under § 2254(d)(2). *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Therefore, "the 'unreasonable determination of the facts' prong does not permit habeas relief 'merely because [the habeas court] would have reached a different conclusion in the first instance' or if 'reasonable minds reviewing the record might disagree about the finding in question.'" *Smith v. Sec'y, Dep't of Corr.*, 800 F. App'x 776, 779-80 (11th Cir. 2020) (quoting *Brumfield*, 576 U.S. at 313-14). For a federal court to grant relief under § 2254(d)(2), just like with § 2254(d)(1), "the

state court's [factual] determination must be 'objectively unreasonable.'" *Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1294 (11th Cir. 2015) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  Objectively unreasonable means more than "merely wrong; even clear error will not suffice." *Tharpe v. Warden*, 834 F.3d 1323, 1338 (11th Cir. 2016) (citation and internal quotation marks omitted).  Therefore, even if a state postconviction court does make a factual error, its decision should still be affirmed if there is a sufficient factual basis to support its conclusion.  *See Pineda v. Warden*, 802 F.3d 1198 (11th Cir. 2015).

In sum, "AEDPA's requirements reflect a presumption that state courts know and follow the law." *Woods*, 575 U.S. at 316 (citation and internal quotation marks omitted).  Therefore, "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.*  Indeed, section 2254(d)'s "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (citation omitted).  "This is especially true for claims of ineffective assistance of counsel . . . in order to afford 'both the state and the defense attorney the benefit of the doubt.'" *Woods*, 575 U.S. at 316-17 (citation omitted).

## B.  INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them.  *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984).  "[D]efendants in state court prosecutions have such right under the Fourteenth Amendment." *Minton v. Sec'y Dep't of Corrs.*, 271 F. App'x 916, 917 (11th Cir. 2008).  The Constitution, however, "does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt*, 571 U.S. at 24.  When assessing counsel's

performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Id.* at 687-88. To establish deficient performance, a petitioner must show that, "in light of all the circumstances, [counsel's performance was] outside the wide range of professionally competent assistance." *Id.* at 690. *See also Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1356 (11th Cir. 2009) ("To establish deficient performance, a defendant must show that his counsel's representation fell 'below an objective standard of reasonableness in light of prevailing professional norms' at the time the representation took place." (citation omitted)). A court's review of performance should focus "not [on] what is possible or what is prudent or appropriate, but only [on] what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. *Id.* at 1317. "Thus, no absolute duty exists to investigate particular facts or a certain line of defense." *Id.* The test for ineffectiveness is not whether counsel could have done more nor whether the best criminal defense attorneys might have done more. *Id.* at 1313 n.12. Instead, to overcome the presumption that assistance was adequate, "a petitioner must 'establish that *no competent counsel* would have taken the action that his counsel did take.'" *Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014) (quoting *Chandler*, 218 F.3d at 1315).

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *Id.* at 697. Further, counsel is not ineffective for failing to raise non-meritorious issues. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

While AEDPA's substantial deference applies to all issues raised in the instant Petition, an additional layer of deference applies to a federal habeas court's review of claims of ineffective assistance of counsel under *Strickland*. *Cullen*, 563 U.S. at 190 ("Our review . . . is thus 'doubly deferential.' We take a 'highly deferential' look at counsel's performance through [§ 2254(d)'s] 'deferential lens.'" (internal citations omitted)); *but see Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333-36 (11th Cir. 2013) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland*'s performance prong, not to the prejudice inquiry). Under the "doubly deferential standard" applicable to ineffective assistance of counsel claims, "the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1126 (11th Cir. 2012) (citation omitted). "[I]f, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of *Strickland* was not unreasonable and AEDPA precludes the grant of habeas relief." *Id.* (citation omitted). Ultimately, the requisite "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in

which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).

## IV. <u>ANALYSIS</u>[3]

As noted above, Petitioner raises two grounds in his Petition. Both grounds contend that the state court unreasonably applied *Strickland* – they are not premised upon the "contrary to" prong of § 2254(d)(1) or upon § 2254(d)(2). Ground I is discussed in Section B below, and Ground II is discussed in Section C below. However, because the State contends that Petitioner failed to fully exhaust the claims presented in Ground I of the Petition, I first address the issue of exhaustion in Section A below. In addressing the issue of exhaustion and both grounds raised in the Petition, I treat the State's response to Petitioner's state court postconviction motion, R. 122-27, as supplying the state court's presumptive rationale for denying Petitioner's postconviction motion, given that the state court incorporated the State's response in summarily denying Petitioner's motion.[4] *See Ether v. Dixon*, No. 20-60241-CIV, 2022 WL 1908918, at *8 (S.D. Fla. June 3, 2022) ("[S]ince the state postconviction court simply adopted the State's Postconviction Response . . . we presume that the court simply adopted that response."); *Dragic v. Inch*, No. 17-81253-CV, 2021 WL 836883, at *9 (S.D. Fla. Mar. 5, 2021) ("The Fourth District Court of Appeal ('Fourth DCA') affirmed the trial court's denial without a written opinion. Since the Fourth DCA affirmed without a written decision, we 'look through' to the next reasoned decision (i.e., the trial court's

---

[3] As a preliminary matter, I find (and the State does not dispute) that the Petition is timely.

[4] Petitioner also recognizes that the state court adopted the State's response in denying Petitioner's motion for postconviction relief. *See* [DE 1] at 17, 23, 25, 28.

Order Denying Post Conviction Relief, which incorporated the State's Response) as the presumptive reasoning of the Fourth DCA." (internal citation omitted)).[5]

## A. EXHAUSTION

"[A]ny federal claims presented to a district court in a habeas petition from a state prisoner must have first been exhausted in the state court system." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1128-29 (11th Cir. 2022); *see also Mauk v. Lanier*, 484 F.3d 1352, 1357 (11th Cir. 2007) ("Before bringing a § 2254 habeas petition in federal court, a petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion." (citing 28 U.S.C. § 2254(b), (c))). "The exhaustion requirement is grounded in principles of comity and reflects a desire to protect the state courts' role in addressing alleged violations of state prisoners' federal rights." *Mauk*, 484 F.3d at 1357 (citing *Thomas v. Crosby*, 371 F.3d 782, 813 (11th Cir. 2004)); *see also Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1294 (11th Cir. 2014) (noting that the exhaustion requirement gives the state court system "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."). In order to satisfy the exhaustion requirement, a "prisoner must 'fairly present' his federal claim in each appropriate state court." *Taylor*, 760 F.3d at 1294-95. "Comity also requires that the claims the prisoner presents to the district court be the *same claims* the prisoner exhausted in the state courts." *Green*, 28 F.4th at 1129. "To the extent the claims are not the same—in terms of their 'legal theory and facts on which they rest'—as the claims exhausted in the state courts, the federal court will treat the claims as unexhausted." *Id.* (cleaned up) (citation omitted). Significantly, "general, conclusory statements are insufficient to preserve a claim for federal habeas review." *Ledford v.*

---

[5] *See also Cardona v. Dixon*, No. 19-81567-CIV, 2022 WL 2158715, at *6 (S.D. Fla. June 14, 2022); *Brown v. Dixon*, No. 19-60704-CIV, 2022 WL 1197657, at *11-12 & n.10 (S.D. Fla. Mar. 15, 2022).

*Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1162 (11th Cir. 2020) (citing *Kelley v. Secretary for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004)).  In other words, the exhaustion requirement mandates that a habeas petitioner "do more than scatter some makeshift needles in the haystack of the state court record."  *Id.* (quoting *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005)).

Here, the State concedes, and I agree, that Petitioner exhausted the claim he presents in Ground II of his Petition.  With respect to Ground I, however, the State only concedes that part of the claim set forth therein was exhausted.  Specifically, in Ground I, Petitioner contends that he received ineffective assistance of counsel because his counsel failed to move to suppress the incriminating recordings of phone calls between Petitioner – who was in the county jail at the time – and Walker.  Petitioner argues that, although his trial counsel objected to the admission of such recordings, counsel's performance was deficient because counsel should have moved to suppress the recordings for two reasons that he failed to raise: (1) law enforcement created an expectation of privacy; and (2) the recordings and incriminating statements contained therein were the product of a violation of Petitioner's Sixth Amendment right to counsel.  The State concedes, and I agree, that the expectation of privacy aspect of Ground I was exhausted.  However, the State disputes that the right to counsel component of Ground I was exhausted.

While a close call, I find that Ground I was exhausted.  According to the State, "Petitioner did not exhaust a claim that counsel should have moved to suppress the recordings based on a violation of his Sixth Amendment right to counsel, because the Sixth Amendment is only mentioned in the heading of the claim."  [DE 5] at 8.  In this regard, Petitioner asserted in the heading of Ground D of his *pro se* postconviction motion – filed with the state trial court – that counsel was ineffective because he

> failed to file a motion to suppress incriminating recordings *made at behest of [an] informant*, intercepted over [the] jail phone, where law enforcement Agent Walker stated to [Petitioner], the calls were masked and could not be recorded, which deliberately fostered an expectation of privacy, *circumventing his right to counsel*, making such recordings inadmissible and, in violation of his *Sixth* and Fourteenth Amendment rights under the United States Constitution.

R. 110 (emphasis added).

The State correctly implies that, aside from scattering some makeshift needles in the heading – i.e., "made at the behest of [an] informant," "circumventing his right to counsel," and a reference to the Sixth Amendment[6] – Ground D otherwise fails to contend that Petitioner's trial counsel should have sought suppression on Sixth Amendment grounds. Therefore, I would ordinarily agree with the State that Petitioner failed to exhaust this argument. However, I find that the State's exhaustion argument here fails for a few reasons (at least when considered together).

First and foremost, in its response to Petitioner's state court postconviction motion, the State seemed to recognize that Petitioner was arguing that counsel should have sought suppression of the recordings on Sixth Amendment grounds (among other grounds). In its single-paragraph response to Ground D of Petitioner's postconviction motion, the state argued, *inter alia*, that "[i]t was clear from the testimony of Detective Walker that Oscar Izquierdo was not put in protective custody with the defendant in order to get incriminating evidence on the defendant, and it was the defendant who approached Izquierdo about eliminating witnesses." R. 125-26. Had the State only viewed Petitioner as raising an expectation of privacy argument and not a Sixth Amendment basis for suppression of the recordings, there would have been no reason to include this statement in the State's Response. Moreover, as noted above, the state court incorporated the State's response in

---

[6] Although I include Petitioner's use of the words "Sixth Amendment" in this list, I recognize that Petitioner was likely referring generally to his right to effective assistance of counsel, not specifically to his right to have counsel present during questioning (given that his other headings also contained the same reference to the Sixth and Fourteenth Amendments).

summarily denying Petitioner's postconviction motion.  Therefore, no comity concerns are present given that the state court had the opportunity to – and did in fact – pass upon Petitioner's argument that a motion to suppress should have been filed on Sixth Amendment grounds.

Second, after the State – and, by extension, the state trial court – seemed to recognize that Petitioner was raising the Sixth Amendment issue in his postconviction motion, Petitioner more explicitly addressed the issue in his appeal of the state court's order denying his postconviction motion.  *See* R. 159-61.  Third, the alleged facts on which Petitioner bases Ground I were largely presented in the state court system (except as discussed in Section B.2 below).  Finally, two of the main cases Petitioner relied on in his state court postconviction motion involved, in addition to expectation of privacy issues, issues concerning suppression on Sixth Amendment grounds.  *See Cox v. State*, 26 So. 3d 666, 676-77 (Fla. 4th DCA 2010); *State v. Calhoun*, 479 So. 2d 241, 245 (Fla. 4th DCA 1985) (finding motion to suppress videotape should be granted on several grounds, including because it was obtained in violation of defendant's Sixth Amendment right to counsel).  Accordingly, for the foregoing reasons, I find that Ground I of the Petition was fully exhausted under the circumstances of this case.

**B.  GROUND I (Incriminating Recordings)**

The Petition should be denied as to Ground I.  As discussed in the preceding section, while counsel sought to exclude the recordings on different grounds, Petitioner argues that his trial counsel performed deficiently by not filing a motion to suppress incriminating recordings on expectation of privacy and Sixth Amendment grounds.  The State's response to Petitioner's postconviction motion, which the state court incorporated into its order denying postconviction relief, stated, in pertinent part, the following:

> The allegation of the defendant that trial counsel was ineffective in failing to file a motion to suppress the undercover jail calls is without merit. Initially, trial counsel

attempted to suppress the phone calls during trial, which was rejected by the Court (Exhibit XI). Counsel also preserved this issue for appeal by objecting prior to the admission of the recording (Exhibit XII, p. 931). Regardless, this claim must be summarily denied, because law enforcement did not purposely foster an expectation of privacy as in *Cox v. State*, 26 So. 3d 666 (Fla. 4th DCA 2010). This case is analogous to *Illinois v. Perkins*, 110 S. Ct. 294 (1990), where the United States Supreme Court held that conversations between undercover agents and defendants do not implicate the concerns of *Miranda v. Arizona*. In *Halm v. State*, 958 So. 2d 392 (Fla. 2d DCA 2007), the Second DCA applied *Perkins* to cooperating private individuals. It was clear from the testimony of Detective Walker that Oscar Izquierdo was not put in protective custody with the defendant in order to get incriminating evidence on the defendant, and it was the defendant who approached Izquierdo about eliminating witnesses (Exhibit XII). In none of the phone calls was there any assurance that the conversations would remain confidential (Exhibit XII). As noted in the motion there is no reasonable expectation of privacy in the jail. Counsel effectively cross-examined Detective Walker about the reputation of Oscar Izquierdo (Exhibit XII, pp. 944-948), and emphasized the unreliability of that person in closing argument (Exhibit IV, pp. 1026-1028). Since this claim is legally insufficient, and otherwise refuted by the record, relief must be summarily denied.

R. 125-26.

### 1. Petitioner's Expectation of Privacy Argument

The state court reasonably applied *Strickland* in concluding that counsel was not constitutionally ineffective for not seeking to exclude the recordings on expectation-of-privacy grounds. Specifically, the state court reasonably found that, contrary to Petitioner's argument, law enforcement did not purposely create a reasonable expectation of privacy.[7] Petitioner fully recognizes in his Petition that "[i]t is well settled there is no reasonable expectation of privacy in calls made from a jail phone." [DE 1] at 20 (citing *Jackson v. State*, 18 So. 3d 1016, 1030 (Fla. 2009)). Nonetheless, Petitioner argues that an exception exists if law enforcement "deliberately foster[s] an expectation of privacy." *Id.* (quoting *Allen v. State*, 636 So. 2d 494, 497 (Fla. 1994)).

---

[7] Of course, "counsel is 'not ineffective for failing to raise a nonmeritorious issue.'" *Ward v. Dep't of Corr.*, No. 20-13797-C, 2021 WL 4772143, at *4 (11th Cir. Apr. 20, 2021) (quoting *Chandler*, 240 F.3d at 917).

Petitioner contends that the exception is met here because the false statements of law enforcement (i.e., Walker's comment that someone listening in would only hear static) led to Petitioner having "an unreasonable expectation of privacy," especially given that Izquierdo (and not Petitioner) was on the phone when the recording was played. *Id.* at 21.

In his Petition, Petitioner does not discuss any authority that he considers to be analogous on this issue. However, in his state court postconviction motion, he argued that the facts of this case are "somewhat analogous" to the facts in *Cox*. R. 112 (citing *Cox*, 26 So. 3d 666). But a review of *Cox* shows that it is far from analogous. In *Cox*, the defendant told law enforcement that he did not want to discuss an alleged robbery "out of fear the conversation was being recorded." 26 So. 3d at 676. To assuage this concern, a detective "repeatedly and convincingly assured [him] that no such recording was being performed." *Id.* It was only after receiving such assurances that the defendant answered questions and later made incriminating statements to a co-defendant who law enforcement "strategically placed inside the interrogation room." *Id.* Therefore, on appeal, the court held that law enforcement's actions "created a reasonable expectation of privacy in the interrogation room," making suppression warranted. *Id.*

The facts of this case are not at all analogous. Petitioner never expressed any concern regarding whether or not his calls with Walker were being recorded or whether anyone else may be listening in to the call. Indeed, when initially asked by Walker, Petitioner acknowledged that there were other people around him (although he later indicated otherwise). Petitioner also subsequently indicated during the call that he wanted to continue his conversation with Walker in a subsequent call because it was "too loud" around him, suggesting that he had been speaking with Walker in the presence of others. Additionally, Walker never told Petitioner (and certainly not repeatedly or convincingly) that the calls were or were not being recorded. While Walker did

interject with his oddly-timed static comment, Petitioner seemed unfazed by the comment. *See* T. 934. Moreover, by the time Walker made his static comment, Petitioner had already made incriminating statements. *See* T. 932-33. Tellingly, Petitioner seems to concede in the Petition that the expectation of privacy allegedly fostered by law enforcement was an "unreasonable" expectation of privacy. As noted above, the court in *Cox* found a "reasonable" expectation of privacy existed due to law enforcement's actions.[8]

At any rate, the state court reasonably found in this case – in adopting the State's response to Petitioner's postconviction motion – that "law enforcement did not purposely foster an expectation of privacy." R. 125. It also reasonably found that Petitioner's phone calls with Walker did not contain "any assurance that the conversations would remain confidential." R. 126. Moreover, even if the recordings of calls with Walker had been excluded, Petitioner's expectation of privacy argument could not have served as a basis to prevent Walker from testifying regarding the conversations between Walker and Petitioner. *Cf. Garcia v. Sec'y, Dep't of Corr.*, No. 5:17-CV-121-OC-39PRL, 2020 WL 708139, at *20 (M.D. Fla. Feb. 12, 2020) (rejecting expectation of privacy argument in the context of jail calls and noting that even if a reasonable expectation of privacy had existed, "there was no prejudice because Petitioner's ex-wife and sister could have testified as to the content of the conversations").[9]

---

[8] As noted in the exhaustion section above, in addition to relying on *Cox,* Petitioner also relied on *Calhoun* in his state court postconviction motion. However, *Calhoun* is also distinguishable. In *Calhoun*, after the defendant was read his *Miranda* rights, he asked to speak to his brother *privately*. 479 So. 2d at 243. After bringing the brother into the interrogation room, law enforcement "exited the room giving every indication that the conversation [between the brothers] was to be secure and private." *Id.* However, law enforcement secretly recorded the brothers' conversation. *See id.* at 243-45. Here, Petitioner made no such demand for privacy and was not speaking with a trusted family member.

[9] It is worth noting that Judge Altonaga previously rejected Petitioner's expectation of privacy argument in a habeas petition that Petitioner filed in a different matter. *See* Order [DE 12], *Toha v. State of Florida*, No. 19-cv-62253 (S.D. Fla. Jan. 14, 2021). That matter pertained to Petitioner's

For the foregoing reasons, the state court reasonably found that Petitioner's trial counsel was not ineffective for not seeking to exclude the recordings on expectation-of-privacy grounds. Notably, as the State (and, by extension, the state court) recognized, counsel did attempt to exclude the recordings on different grounds.  While he was ultimately unsuccessful, it was not an unreasonable decision to proceed on the theory he did advance.  Even assuming that Petitioner would have had a good argument for suppression on expectation-of-privacy grounds, which seems unlikely, "a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ."  *Lundberg v. Sec'y, Fla. Dep't of Corr.*, 808 F. App'x 725, 734-35 (11th Cir. 2020) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)).  But the state court reasonably found no such deficient performance here.  Therefore, the state court did not unreasonably apply *Strickland*.

### 2. Petitioner's Sixth Amendment Argument

In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court held "that the Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed." *Lightbourne v. Dugger*, 829 F.2d 1012, 1019-20 (11th Cir. 1987) (citing *Massiah*, 377 U.S. at 206).  Thus, law enforcement violates an accused's Sixth Amendment rights if it

---

conviction (in a separate case) for soliciting Walker to murder the witnesses identified on the recordings of calls between Petitioner and Walker.  Although Petitioner's habeas petition in that matter involved facts that are not presented in this matter (as well as recordings of additional calls), the substance of Petitioner's expectation of privacy argument in that matter, which Judge Altonaga rejected, was essentially the same (however, Petitioner's Sixth Amendment argument, which is discussed in the next section, was not at issue in that case). *See id.* at 19-21.  It is also worth noting that one of the facts presented in that case, which is not reasonably subject to dispute, is that although Petitioner was not on the phone to hear the warning at the outset about calls being recorded, there was a sign posted by the phone that provided the same warning.  *Id.* at 3.

"instruct[s] a paid informant to develop a relationship of trust and confidence with the accused in jail and secure incriminating information by stimulating conversation" (provided that the Sixth Amendment right to counsel has already attached). *Id.* at 1020 (citing *United States v. Henry*, 447 U.S. 264, 274 (1980)). Consequently, "[i]n order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent; and (2) that the inmate deliberately elicited incriminating statements from the accused." *Id.* (citations omitted). With respect to the first prong,

> There is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel. The answer depends on the "facts and circumstances" of each case. At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place.

*Depree v. Thomas*, 946 F.2d 784, 793-94 (11th Cir. 1991) (internal citation omitted).

Based upon the foregoing law, Petitioner contends that his trial counsel should have sought suppression of the Walker recordings on Sixth Amendment grounds. As an initial matter, though, Petitioner only discusses the government agent requirement and does not discuss how Izquierdo supposedly deliberately elicited any incriminating statements from Petitioner – the statements at issue were made during a conversation between Petitioner and Walker, not Petitioner and Izquierdo.[10] At any rate, Petitioner has failed to establish that the state court's determination on

---

[10] Petitioner does assert that, "Contrary to the factual rationale of the State's response, it was not clear from Investigator Walker's testimony that Izquierdo was approached by Petitioner about eliminating witnesses." [DE 1] at 23. Yet, crucially, Petitioner alleged no countervailing facts (either in his Petition here or, more importantly, in his state court postconviction motion) about who initiated his interactions with Izquierdo or how those interactions led to Petitioner's calls to Walker. Thus, Petitioner provided the state court with no basis on which to conclude that trial counsel had a successful means of establishing the second prong of Petitioner's proposed Sixth Amendment claim. Indeed, he did not even sufficiently allege or demonstrate a factual dispute to impel the state court to hold an evidentiary hearing on the matter.

the government agent prong was unreasonable and has thus failed to establish that the state court unreasonably applied *Strickland*.

Importantly, this Court must take the facts as they were presented to the state court. *See Cullen*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). And the facts before the state court, *including the alleged facts set forth in Petitioner's state court postconviction motion*, could not have established the government agent prong or created an evidentiary issue regarding this prong. In fact, Petitioner's state court postconviction motion referred to an unnamed informant in a heading (R. 110) and separately mentioned that the portions of the recordings between Walker and Izquierdo (but not Petitioner) were removed before the recordings were played at trial (R. 111), but the motion provided no alleged facts regarding Izquierdo or his status as a potential government agent.

Now, however, Petitioner argues in the Petition that Izquierdo was a government agent because there was an implied agreement that Izquierdo would receive leniency for his assistance. In arguing that there was such an implied agreement, Petitioner contends (in his Petition) that Izquierdo was "between a rock and a hard place" due to all of the charges that he was facing and, based on supposition and conjecture, assumes that there must have been some implied agreement of leniency in place. However, even putting aside the conjectural nature of these allegations, none of this was before the state court. What was before the state court was Walker's testimony: (1) that he became aware of Izquierdo when Izquierdo "contacted us and advised that he had someone that he met in the jail [i.e., Toha] that wanted to have some witnesses killed" (T. 850; *see also* T. 929-30); (2) that Izquierdo then put Walker in touch with Toha after reporting this (T. 850, 930); and (3) that – in response to being asked whether Izquierdo was "trying to make cases to help law

enforcement and to try to help his own position with his own criminal cases" – "I don't know what he was trying to do, 'cause we don't promise anything, and I didn't get involved with any of his charges, and I never told him that I would help him with anything.  So, I don't know what his actual thoughts were."  (T. 945).

Notably, Petitioner did not put forth any countervailing allegations (in his state court postconviction motion) that conflicted with Walker's testimony.  Thus, based on the facts that were before the state court, there was no evidence *or allegations* whatsoever to support the existence of any implied agreement between law enforcement and Izquierdo, and thus no agreement to support the government agent prong.  Therefore, this Court cannot find that the state court's determination was unreasonable.  Moreover, the Petition does not even argue that the state court made any unreasonable findings of fact.  Rather, Petitioner only contends that the state court unreasonably applied *Strickland*.  Thus, Petitioner has forfeited any argument that the state court made unreasonable findings of fact.

Ultimately, there was virtually nothing before the state court from which it could have concluded that Petitioner had a viable Sixth Amendment argument.  Therefore, the state court did not unreasonably apply *Strickland*.

### C.  GROUND II (Motion in Limine)

The Petition should be denied as to Ground II.  In Ground II of the Petition, Petitioner contends that his trial counsel performed deficiently by failing to file a motion in limine to exclude evidence of the black plastic bags and rolls of tape found in Petitioner's house.  According to Petitioner, such evidence was not relevant, or at the very least, more prejudicial than probative.  As with Petitioner's other arguments, the state court rejected this argument based on the State's response to Petitioner's postconviction motion, which stated, in pertinent part, the following:

> The allegation of the defendant that trial counsel was ineffective in failing to file a motion in limine regarding references to the tape and garbage bags is without merit. There was no basis to file a motion in limine or even object to the testimony regarding these items, because the testimony was relevant to demonstrate that these items found in the house were also found on the body of the victim when she was eventually discovered (Exhibit V, pp. 545-554). Furthermore, there was no prejudice where trial counsel emphasized the fact that no evidence linking the defendant to these items, nor was there any further testing on these items to link anyone to the murder (Exhibit V, pp. 597-601). Additionally, trial counsel used the lack of evidence to argue that the defendant was not guilty of the crime (Exhibit IV, pp. 1030-1035). Because there was neither a deficiency on the part of counsel, nor prejudice to the defendant, relief must be summarily denied.

R. 124.  Petitioner argues this was an unreasonable application of *Strickland*.  It was not.

Petitioner presumes that his proposed motion in limine would have been granted and that it was so clearly meritorious that trial counsel's failure to file such a motion was objectively unreasonable.  However, while such a motion would not have been frivolous, for the reasons adopted by the state court and further described below, such a motion likely would have been denied.  At the very least, viewed through the "doubly-deferential" standard of review, it was well within reason for the state court to conclude that trial counsel's performance was within "the wide range of professionally competent assistance."  *See Strickland*, 466 U.S. at 690.

As set forth in the Florida Evidence Code, "[r]elevant evidence is evidence tending to prove or disprove a material fact."  § 90.401, Fla. Stat.  While relevant evidence is generally admissible, *see* § 90.402, Fla. Stat., it "is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."  § 90.403, Fla. Stat.

Here, the relevance of the evidence at issue is evident.  The black plastic bags and certain rolls of tape found in the Toha residence were consistent with the bags and tape found on Surya's body.  Moreover, evidence indicated that Surya was murdered at the Toha residence.  Additionally, Petitioner and Surya were the only adults who resided at the Toha residence.  Thus, the state court

24

reasonably concluded that the evidence of the bags and tape was relevant to proving a material fact – whether Surya was murdered at the Toha residence and, ultimately, whether Petitioner (the only other adult living at that residence) committed the murder.

Now, that is not to say that admission of the bags and tape found at the Toha residence could not have caused any prejudice. After all, "[r]elevant evidence is inherently prejudicial; however it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matters." *Veach v. State*, 254 So. 3d 624, 627 (Fla. 1st DCA 2018) (quoting *State v. Blackwell*, 787 So. 2d 963, 965 (Fla. 1st DCA 2001)). Notably, a "court's discretion to exclude evidence under Rule 403 is narrowly circumscribed. Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. The balance under the Rule, therefore, should be struck in favor of admissibility." *Id.* (quoting *State v. Gerry*, 855 So. 2d 157, 163 (Fla. 5th DCA 2003)) (internal quotation marks omitted). Petitioner does little to articulate how the bags and tape posed a danger of *unfair* prejudice nor how that danger *substantially* outweighed their probative value. *See* [DE 1] at 27 (asserting that "the entry of the bags and tape was more prejudicial than probative."). Rather, while the probative value of the bags and tape was not overwhelming (in the absence of additional forensic evidence), their potential for causing unfair prejudice did not substantially outweigh that probative value, especially in light of defense counsel's ability to highlight the lack of forensic evidence.

Petitioner relies on four Florida cases in contending that the bags and tape evidence lacked a "sufficient nexus" to the crime charged to be admitted at trial. *See* [DE 1] at 26 (citing *Agatheas v. State*, 77 So. 3d 1232, 1236 (Fla. 2011); *Okafor v. State*, 225 So. 3d 768, 773 (Fla. 2017); *Nshaka v. State*, 92 So. 3d 843, 847-48 (Fla. 4th DCA 2012); *Jones v. State*, 32 So. 3d 706, 712-13 (Fla.

4th DCA 2010)).  However, these cases are easily distinguishable.  In all of these cases, the connection between the challenged evidence and the crime charged was substantially weaker – indeed, non-existent or completely speculative – than in Petitioner's case.  Moreover, in three of the four cases, the challenged evidence related to firearms or ammunition, creating a greater likelihood of undue prejudice than the challenged items here.

For instance, in *Agatheas*, the Florida Supreme Court noted that it previously held evidence of a firearm to only be admissible where there is "a sufficient link between the weapon and the crime."  77 So. 3d at 1236 (quoting *Jackson v. State*, 25 So. 3d 518, 528 (Fla. 2009)).  In finding that a sufficient link did not exist, the court explained that the gun at issue was found five years after the crime was committed and "was in no way connected to the murder" given that it was "uncontested that [it] was not the murder weapon."  *Id.* at 1237.  The clear absence of a link between the firearm and the crime rendered the firearm irrelevant – except to the extent it (impermissibly) suggested a propensity to commit other crimes – and created a high risk of juror confusion.  *Id.* at 1237-40.  By contrast, the bags and tape found in the Toha residence had at least some connection to those found on Surya's body – at the very least, it was contested whether the bags and tape found in the residence were the same as those found on Surya's body, with plausible testimony that they were similar.  And the bags and tape found in the residence were found immediately after Surya's body was discovered, which was roughly two weeks after Surya was murdered.[11]  Moreover, unlike the firearms and ammunition at issue in *Agatheas* and *Okafor*, the bags and tape at issue here created no suggestion of a propensity to commit crimes or other

---

[11] *Okafor* is likewise distinguishable.  There, the Florida Supreme Court found evidence of high capacity .22 and .223 caliber magazines to be irrelevant because such evidence did not tend to establish who was carrying an AK-47 given that an AK-47 does not fire .22 or .223 caliber rounds. 225 So. 3d at 773.  Thus, contrary to this case, the State was trying to draw a connection between two items (the magazines and AK-47) that could not have had a connection.

potential unfair prejudice. They were innocuous items but-for their potential connection to Surya's murder.

The two state appellate court cases upon which Petitioner relies are also inapposite. In *Nshaka*, the court found that latex gloves – found at a house to which the defendant had a key, even though he apparently resided elsewhere – were inadmissible. *See* 92 So. 3d at 845-48. It explained that "while the State intended to introduce the gloves into evidence to show why there were no fingerprints on the victim's vehicle, the State did not introduce evidence to show that those gloves were connected to that burglary charge, nor that the gloves were connected to Nshaka." *Id.* at 848. In this case, however, the State offered at least some evidence to demonstrate a connection between the black plastic bags and tape found in the Toha residence and those found on Surya. The bags and tape found in the home were similar to those found on Surya, and Petitioner and Surya were the only adults who resided at the home. Additionally, the bags and tape found at the home were found shortly after Surya's murder,[12] and evidence was presented to show that Surya was murdered at the home (where the bags and tape were found).[13] Thus, there was evidence of a link or connection presented, albeit evidence that Petitioner's trial counsel argued should be given little weight because of the absence of additional, more substantial

---

[12] In *Nshaka*, the gloves were found 80 days after the burglary in that case was committed. *Id.* at 847.

[13] I also note that Petitioner's attempt to compare this case to *Nshaka* is a bit of an apples-to-oranges comparison. As noted above, in *Nshaka*, the State sought to introduce evidence of the latex gloves (that may or may not have belonged to the defendant) in an attempt to explain why fingerprints could not be found. But there was apparently no indication that latex gloves had been used during the relevant burglary or otherwise had any connection to that burglary. That is substantially different from showing that a defendant possessed items similar to those found at the scene of the crime. In other words, if, for example, a latex glove was found at the scene of the crime in *Nshaka* and the defendant in *Nshaka* resided in the home where the latex gloves were found, then an apples-to-apples comparison would likely exist. However, the facts in *Nshaka* are what they are. What they are not, though, is analogous to the facts here.

connections.[14]  Because the evidence of the bags and tape was relevant and not unduly prejudicial, it is unlikely that Petitioner's proposed motion in limine would have been granted, and the state court reasonably found that trial counsel's performance was not deficient.

Moreover, the state court *reasonably* found a lack of prejudice from trial counsel's failure to file a motion in limine because: (1) "trial counsel emphasized the fact that [there was] no evidence linking the defendant to these items, nor was there any further testing on these items to link anyone to the murder"; and (2) "trial counsel used the lack of evidence to argue that the defendant was not guilty of the crime."  R. 124.  In this regard, as the State notes in its response, Petitioner's trial counsel elicited testimony showing, *inter alia*, that even though law enforcement deemed the plastic bags and tape found in the Toha residence to be similar to the bags and tape found on Surya's body, law enforcement was unable to confirm that the two were one and the same.  *See* [DE 5] at 39; T. 598-600.  Additionally, Petitioner's trial counsel attempted to show reasonable doubt by arguing during closing arguments that the State did not find Petitioner's DNA on the tape and bags found on Surya's body.  *See* [DE 5] at 40; T. 1030-36.

Ultimately, for the reasons discussed above, I disagree with Petitioner that evidence of the black plastic bags and tape found at the Toha residence would have been excluded had his trial counsel filed a motion in limine.  But more importantly, the state court reasonably found that Petitioner's motion-in-limine contention failed to demonstrate deficient performance or prejudice. Therefore, it did not unreasonably apply *Strickland*.

---

[14] *Jones*, the other state appellate court case upon which Petitioner relies, is also inapposite.  In *Jones*, the court found that evidence of a gun cleaning kit the defendant owned should have been excluded because nothing was shown to connect it to the crime charged.  32 So. 3d at 713.  Rather, "[i]ts admission served only to suggest that at some point the defendant owned a gun."  *Id.* However, as discussed above, there was at least some evidence of a connection in this case between the bags/tape found in the Toha residence and those found on Surya.

## V. <u>REQUEST FOR EVIDENTIARY HEARING</u>

Petitioner has not shown that an evidentiary hearing is necessary.  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  Petitioner has the burden to establish the need for an evidentiary hearing.  *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011).  "[T]he district court need not conduct an evidentiary hearing if the record refutes the petitioner's factual allegations, otherwise prevents habeas relief, or conclusively demonstrates that the petitioner was not denied effective assistance of counsel." *Martinez v. Sec'y, Fla. Dep't of Corr.*, 684 F. App'x 915, 926 (11th Cir. 2017) (citing *Schriro*, 550 U.S. at 474).  A Petitioner's conclusory allegations fail to demonstrate that an evidentiary hearing is warranted. *Chavez*, 647 F.3d at 1061.

Furthermore, the deferential standards of habeas review under § 2254 apply in determining whether an evidentiary hearing is appropriate.  *See Schriro*, 550 U.S. at 474 ("If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.").  Thus, "before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record." *Landers*, 776 F.3d at 1295.

Here, Petitioner fails to carry his burden.  Specifically, Petitioner fails to demonstrate the existence of any basis to warrant a federal evidentiary hearing.  Indeed, his request for an evidentiary hearing was limited to a perfunctory request in his prayer for relief, without further

explanation, argument, or justification.  *See* [DE 1] at 15; [DE 12] at 8.  Rather, Petitioner's claims are all resolvable based upon the state court record without the need to develop the record further. Therefore, I find that an evidentiary hearing is unnecessary and decline to hold one.

## VI. <u>CERTIFICATE OF APPEALABILITY</u>

A habeas petitioner seeking to appeal a district court's final order denying his habeas petition has no absolute entitlement to appeal; rather, he must obtain a certificate of appealability to do so where "the detention complained of arises out of process issued by a State court."  28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009).  A court should only issue a certificate of appealability if a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Where a district court has rejected a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Upon consideration of the record, the Court should deny a certificate of appealability because reasonable jurists would not find the assessment of Petitioner's claims debatable or wrong. Notwithstanding, if Petitioner does not agree, Petitioner may bring this argument to the attention of the District Judge in objections to this Report.

## VII. <u>CONCLUSION</u>

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court **DENY** the Petition [DE 1].

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

     **DONE AND SUBMITTED** in Fort Lauderdale, Florida this 15th day of September 2022.

**Jared M. Strauss**
**United States Magistrate Judge**